**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

OCT 14 2025

TAMMY H. DOWNS, CLERK

By: _____

DEP CLERK

Addendum to Complaint    4:25-cv-1067-KGB

3.A. 2019 – False "Theft by Receiving" Case (LRCR-19-6170)

1. In 2019, Plaintiff Brent Lamar Jones was accused of theft by receiving in Pulaski County under docket LRCR-19-6170 even though the underlying dispute concerned a civil vehicle repossession matter between private parties.

2. The responding Little Rock Police Department (LRPD) officers treated a purely civil dispute as a criminal event. No officer obtained a judicial determination that a crime had occurred; no officer produced a valid repossession order, lienholder affidavit, or court judgment authorizing police seizure.

3. Officers seized the vehicle and detained Plaintiff under color of law without probable cause, misusing criminal process to aid a private recovery. The seizure was not supported by a warrant, exigent circumstances, or any contemporaneous complaint establishing theft elements.

4. Plaintiff told officers on scene that (a) the matter was civil, (b) police could not lawfully repossess on behalf of a private party, and (c) any dispute had to be handled in civil court. Officers ignored those statements and proceeded as if a felony had occurred.

5. LRPD transported Plaintiff to a police facility where he was handcuffed to a chair. After a period of detention, two detectives entered with a tape recorder and attempted to elicit a guided confession, framing questions to imply criminal "receiving" despite the absence of any evidence of stolen property, criminal intent, or knowledge.

6. Throughout the detention, officers and detectives failed to advise Plaintiff of any valid warrant, failed to show any sworn victim statement alleging theft, and failed to identify a lawful owner demanding return through civil process. The conduct functioned as a collection tool, not a criminal investigation.

7. Relying on the officers' narrative, the Pulaski County Prosecutor's Office filed a felony information for theft by receiving. The filing lacked factual specificity tying Plaintiff to any theft element (knowledge that property was stolen, intent, etc.).

8. After months of reputational harm and litigation strain, the State entered a nolle prosequi, effectively conceding it could not prove the offense. The dismissal did not remedy the original unlawful seizure, custodial coercion, or the criminalization of a civil dispute.

9. The incident caused concrete harm, including: (a) loss of use of the vehicle and related expenses; (b) lost time and income for court appearances; (c) emotional distress from custodial humiliation and coercive interrogation; and (d) creation of a false "criminal history footprint" later cited against Plaintiff in bond settings and courtroom rhetoric.

10. No officer or detective was disciplined for misusing criminal process to effect a private repossession, and no restitution was provided for the unlawful seizure or detention.

11. This 2019 episode established the pattern repeated in later years: leveraging fabricated or inflated criminal allegations to justify seizure, detention, and pressure tactics when civil remedies (if any) were the only lawful path.

B. 2023 – Little Rock Airport "Trespassing" Case (LRCR-23-4948)

1. On or about March 2023, Plaintiff Brent Lamar Jones was falsely arrested at the Bill and Hillary Clinton National Airport in Little Rock, Arkansas, on an alleged charge of "trespassing."
Plaintiff was lawfully present on airport property for the purpose of catching a commercial flight and had paid for his ticket in full.

2. Plaintiff was approached by airport police officers and detained without probable cause. He was accused of being on restricted property despite never crossing any restricted boundary or violating any posted airport rule. Plaintiff calmly attempted to explain his lawful purpose at the airport, but the officers refused to listen, instead placing him in handcuffs and transporting him to detention.

3. The arrest report and subsequent charge were fabricated to justify an unlawful seizure. No credible evidence was ever presented that Plaintiff had committed a criminal trespass. The incident was motivated by bias and retaliatory conduct after Plaintiff had previously reported police misconduct in unrelated matters.

4. The case was assigned in Pulaski County Circuit Court as LRCR-23-4948, under Judge Kamps, with Prosecutor William Martin Jones representing the State. Judge Kamps permitted the prosecution to advance a demonstrably false narrative and allowed witnesses to testify to events that never occurred, despite Plaintiff's repeated objections.

5. At trial, multiple witnesses gave conflicting and demonstrably false testimony. Plaintiff, representing himself pro se, effectively cross-examined each of the State's witnesses, exposing inconsistencies and showing that no element of criminal trespass could be established. Nevertheless, the court refused to credit Plaintiff's defense.

6. The presiding judge interrupted Plaintiff's defense multiple times, sustained objections without legal basis, and prevented him from presenting exculpatory evidence. The environment of the courtroom was hostile and discriminatory. The conviction was a product of judicial bias and prosecutorial misconduct rather than evidence.

7. Following the verdict, Plaintiff timely filed an appeal. Despite his compliance with procedural rules, the appeal was ignored and has remained pending since March 2023 without docket movement or acknowledgment. Plaintiff has repeatedly inquired into the status of the appeal to no avail.

8. After the ignored appeal, the case was transferred first to Judge Karen Whatley, who likewise failed to address the defective conviction or the appeal, and then later to Judge

Leon Johnson, who currently holds consolidated authority over multiple of Plaintiff's cases. Each judge has refused to act on Plaintiff's motions to vacate or dismiss.

9. This case demonstrates a recurring pattern in Pulaski County: when Plaintiff exposes misconduct or exercises constitutional rights, judges and prosecutors collaborate to suppress the record, delay hearings, and deny access to lawful appellate review. The 2023 Little Rock Airport case stands as the earliest sustained instance of that coordinated retaliation and remains open on the docket nearly three years later.

10. Plaintiff's arrest and conviction in this matter violated his Fourth Amendment right against unreasonable seizure, Fourteenth Amendment right to due process and equal protection, and his First Amendment right to petition for redress of grievances, as his appeals and motions have been deliberately obstructed.

C. 2024 – Judge Whatley to Judge Johnson Transfer (60CR-24-1204)

1. On or about March 2024, Plaintiff Brent Lamar Jones was subjected to continued judicial misconduct and discrimination after filing multiple motions challenging false charges and procedural irregularities in the Pulaski County Circuit Court.

2. The case, designated 60CR-24-1204, was initially assigned to Judge Karen Whatley, a white female judge, who demonstrated hostility, bias, and a lack of judicial impartiality from the outset.
Plaintiff appeared before Judge Whatley expecting fair adjudication of the facts and law, but instead encountered repeated instances of dismissiveness, sarcasm, and intentional mischaracterization of his legal filings.

3. Judge Whatley lied on the record by verbally acknowledging Plaintiff's right to proceed pro se, then later altering the official docket to falsely indicate otherwise.
This manipulation of the record deprived Plaintiff of his self-representation rights and created a paper trail intended to discredit his legitimate court filings.

4. Throughout the proceedings, Judge Whatley ignored Plaintiff's substantive motions — including motions to dismiss, motions to compel discovery, and motions to strike — all of which contained evidence proving prosecutorial misconduct and witness perjury. Instead of addressing these filings, Judge Whatley focused on irrelevant emotional tirades, repeatedly cutting Plaintiff off and refusing to allow him to present a defense.

5. When it became evident that the evidence and testimony favored Plaintiff, Judge Whatley attempted to evade accountability for her own misconduct by transferring the case away from herself.
Rather than dismiss the case or correct the record, she abruptly reassigned it to Judge Leon Johnson, a Black male judge, as if transferring control to a "handler" to preserve the fraudulent proceedings rather than end them.

6. The transfer was not made pursuant to any lawful motion, recusal order, or reassignment procedure under Arkansas law. It was done arbitrarily and in bad faith, after Plaintiff exposed contradictions in the State's case and on-the-record inconsistencies by both the court and the prosecution.

7. Once reassigned, Judge Leon Johnson refused to correct the record or address the falsehoods created by Judge Whatley.
Instead, he perpetuated the misconduct, continuing to delay hearings, ignore pending motions, and allow the prosecution to proceed without evidence or discovery compliance.

8. The continued prosecution under 60CR-24-1204 constitutes ongoing harassment and denial of due process. Both Judge Whatley and Judge Johnson have deliberately avoided addressing Plaintiff's constitutional claims, ensuring that the case remains indefinitely open as a means of coercion and control.

9. Plaintiff's constitutional rights under the First, Fourth, Fifth, and Fourteenth Amendments have been repeatedly violated. The unlawful transfer of this case and the refusal of both judges to follow proper legal procedure demonstrate systemic bias and a coordinated effort to obstruct justice and protect judicial misconduct from exposure.

10. As of the filing of this Complaint, Case 60CR-24-1204 remains open, continuing to harm Plaintiff through lost time, emotional distress, and deprivation of liberty, with no legitimate basis for its continued existence.

D. 2024 – Non-Prosecution Agreement Violated (JAC-24-919)

1. In or around early 2024, Plaintiff Brent Lamar Jones appeared in Jacksonville District Court before Judge Rita Bailey concerning contested matters that the prosecution and the Court had agreed would be resolved through a Non-Prosecution Agreement (NPA).

2. Judge Bailey stated clearly in open court that Plaintiff's case would not proceed to prosecution and that, in lieu of dismissal, Plaintiff would pay a fine under the NPA as a symbolic administrative resolution. She expressly told Plaintiff, "Don't worry about it, just pay the fine."

3. Plaintiff relied on that representation and promptly arranged to satisfy the NPA fine. The proceeding ended without any adjudication of guilt, conviction, or further obligation. By all appearances, the matter was fully concluded.

4. Immediately before Judge Bailey officially declared the fine, however, Circuit-Court Prosecutor Will Jones arrived unannounced in Judge Bailey's courtroom, handed her a packet containing ten new criminal charges, which actually turned out to be a total culmination of all current cases, consolidated into 1 case and appearing as an entirely new case and left without explanation.
Judge Bailey nonetheless reiterated that the NPA covered the matter and again told Plaintiff that he could go home once the fine was paid.

5. Despite the Court's explicit statement and Plaintiff's compliance, the Pulaski County Prosecutor's Office—acting through Will Jones—ignored the NPA entirely and began reviving and escalating the dismissed charges in the Jacksonville District Court docket JAC-24-919, creating a new ongoing case in a Little Rock Circuit Court where Judge Leon Johnson and Will Jones dispatch Jason Ables to request Plaintiff to plead guilty by insanity or plead guilty by some other variation and if refused the case is prolonged indefinitely, leaving the Plaintiff to repeatedly be harassed with threats of arrest for unrelated offenses that can be provoked by a judge like Failure to Appear or contempt of court. Even if the plaintiff is timely and respectful, the threat of these charges are able to be used as ammo for the judge to grandstand and deviate from the legitimate proceedings and Plaintiff's clear defenses and motions. The case is still ongoing currently at the time of this filing.

6. Over the following months, prosecutors and court staff began billing Plaintiff for fines and fees that had no lawful basis and simultaneously blocked his efforts to appeal or obtain written confirmation of the NPA's terms.
Every attempt Plaintiff made to correct the record or appeal was met with refusals, misplaced filings, or vague docket entries that deliberately obscured the truth.

7. Plaintiff was later informed that the case was being "handled" under the NPA while, paradoxically, new collection actions and bench threats were appearing in the docket. These contradictions demonstrate a coordinated scheme to fabricate monetary obligations and perpetuate a case that had already been resolved.

8. When Plaintiff attempted to file a notice of appeal, the clerk's office and the prosecuting attorney's office each denied attempts and receipt of the paperwork, effectively blocking appellate review and trapping Plaintiff in an impossible procedural loop.

9. The wrongful continuation of JAC-24-919 after execution of the NPA constitutes:

Breach of contract,

Fraud upon the court, and

Violation of due-process and equal-protection rights under the Fourteenth Amendment.

10. Plaintiff has suffered continuing financial harm, emotional distress, and reputational damage from this unlawful conduct. The NPA, which was intended to end prosecution, has instead been manipulated into an instrument of ongoing extortion and harassment by city and county officials.

11. As of the filing of this Complaint, the Jacksonville District Court docket still reflects "open" status, and Plaintiff continues to be charged money under a case that was, by law and by agreement, supposed to be closed.

E. 2024 – Prosecutorial Misconduct and Discovery Abuse (60CR-24-2634)

1. In mid-2024, Plaintiff's case numbered 60CR-24-2634 was filed in the Pulaski County Circuit Court and assigned to Judge Karen Whatley, later transferred to Judge Leon Johnson.

2. The prosecution, led by Deputy Prosecuting Attorney William ("Will") Martin Jones, engaged in repeated acts of misconduct and bad-faith delay from the outset. The case was predicated upon false statements by private complainants and cooperating officers of the Jacksonville Police Department (JPD) who had, by this time, established a pattern of retaliatory charging against Plaintiff.

3. The prosecution's discovery filings openly demanded that Plaintiff—who was at that time recognized pro se—disclose his intended trial defense and legal theories to the State. This request violated Plaintiff's Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to prepare a defense independently without serving as a witness against himself.

4. Plaintiff timely filed multiple motions to dismiss and objections to discovery citing constitutional violations, prosecutorial misconduct, and failure to provide exculpatory

evidence under Brady v. Maryland, 373 U.S. 83 (1963). These motions were either ignored or never docketed, depriving Plaintiff of judicial review.

5. Despite Plaintiff's repeated demands for a speedy trial under Ark. R. Crim. P. 28.1, the prosecution continued to delay, rescheduling hearings and resetting trial dates for over a year while refusing to produce essential evidence—including body-cam footage, police incident reports, and witness statements favorable to Plaintiff.

6. Judge Whatley, rather than enforcing Plaintiff's discovery rights, allowed the prosecution's unconstitutional discovery motion to stand and took no corrective action to protect Plaintiff's rights as a self-represented defendant.

7. The court further ignored Plaintiff's requests for transcripts and docket corrections that would have shown clear discrepancies between what was said in court and what was later recorded in the written record.

8. After the case languished for more than twelve months without lawful trial progression, it became evident that the prosecution's objective was not conviction on the merits but to keep the case open indefinitely to justify ongoing surveillance, harassment, and the threat of re-arrest.

9. This conduct—compelling a defendant to reveal his defense strategy, withholding exculpatory evidence, and intentionally delaying trial—constitutes a pattern of prosecutorial abuse, denial of due process, and malicious prosecution in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

10. The case remains pending, with repeated continuances and no legitimate trial date, despite Plaintiff's compliance with all prior court orders and clear evidence of factual innocence.

11. As of the filing of this Complaint, the prolonged pendency of 60CR-24-2634 continues to inflict professional and emotional harm upon Plaintiff, preventing him from

maintaining employment or travel, and perpetuating public stigma arising from false felony charges.

F. 2025 – Ten False Charges After Non-Prosecution Agreement (60CR-25-477)

1. In early 2025, Plaintiff was unexpectedly charged in Pulaski County Circuit Court, Case No. 60CR-25-477, with ten (10) separate criminal counts arising from the same factual sequence that had already been resolved through a Non-Prosecution Agreement (NPA) negotiated and confirmed in Jacksonville District Court before Judge Rita Bailey.

2. The NPA was formally acknowledged in open court by Judge Bailey, who instructed Plaintiff that the matter would be resolved without prosecution upon payment of a nominal fine and that no conviction would be entered.  Plaintiff relied on that assurance in good faith, paid the fine as ordered, and received confirmation from the court clerk that the matter was concluded.

3. However, immediately before Judge Bailey finalized the NPA, Deputy Prosecuting Attorney William ("Will") Martin Jones—the same prosecutor responsible for the discovery abuses described in Section E—entered Judge Bailey's courtroom during the hearing, handed her a packet of ten new felony charges, all previous bogus charges consolidated into 1 case, and abruptly exited without explanation.

4. Judge Bailey, nonetheless, stated on the record: "Don't worry about that; just pay the fine."  This statement reaffirmed that the NPA remained in force and that no further prosecution was contemplated.

5. In the weeks that followed, Plaintiff learned that those same charges had been unlawfully re-filed in the Circuit Court at the direction of Will Jones, in direct contravention of the district court's NPA disposition.  This maneuver converted a resolved case into an open felony proceeding without any new evidence or probable cause, thereby violating the Double Jeopardy Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment.

6. Upon transfer to Circuit Court, Judge Bailey's jurisdiction was replaced by Judge Leon Johnson, who thereafter became the presiding judge over all of Plaintiff's pending matters. Judge Johnson was immediately made aware that the prior NPA existed and that the fine had been paid, yet he refused to dismiss the charges and instead directed court-appointed attorney Jason Ables to continue "negotiations."

7. Over the following months, Ables repeatedly approached Plaintiff—at Judge Johnson's and Will Jones's instruction—attempting to coerce Plaintiff into pleading guilty or entering an "insanity" plea, rather than moving for outright dismissal based on the NPA. Plaintiff consistently refused, maintaining his innocence and reiterating that the NPA had already disposed of the matter.

8. Rather than respect that record, Judge Johnson scheduled a series of court-ordered mental evaluations designed to delay proceedings and create a pretext to question Plaintiff's competency. Each evaluation resulted in findings that Plaintiff was competent to stand trial, yet the court continued to schedule additional evaluations instead of dismissing the charges.

9. The effect of these serial evaluations and coerced plea discussions was to deprive Plaintiff of his liberty interest and right to a speedy resolution, while inflicting ongoing emotional distress and public humiliation. The pattern demonstrated that the State and the Court were using psychiatric procedures as tools of coercion rather than legitimate inquiry.

10. Throughout 2025, Plaintiff appeared at every scheduled hearing, complied with every order, and continued to demand that the Circuit Court honor the NPA. No new evidence was produced. No lawful basis for continuing prosecution was articulated. The sole purpose of maintaining Case No. 60CR-25-477 has been to exert control, drain resources, and undermine Plaintiff's credibility for having defended himself successfully in earlier proceedings.

11. The reopening of a resolved case, coupled with repeated coercive plea attempts and mental health weaponization, constitutes malicious prosecution, abuse of process, and violation of due process rights under the Fifth and Fourteenth Amendments.

12. The ongoing maintenance of this baseless case prevents Plaintiff from achieving finality, maintaining employment, or relocating, and perpetuates the continuing pattern of judicial retaliation and prosecutorial harassment described throughout this Complaint.

G. 2025 – Warrantless Arrest After Noise Complaint (JAC-25-1102)

1. On or about April 1, 2025, Plaintiff was in his own backyard at 212 Raney Place, Jacksonville, Arkansas, quietly grilling food.  There was no disturbance or excessive noise at the time.

2. A Jacksonville Police Department (JPD) officer arrived at the residence responding to what was reported as a "noise complaint."  By the time the officer arrived, Plaintiff was not making any noise and had done nothing unlawful or disorderly.

3. Without a warrant and without probable cause, Officer Junior approached Plaintiff's property, then reached over Plaintiff's six-foot backyard fence and grabbed Plaintiff's arm as Plaintiff was walking toward his house.

4. The officer's sudden, unauthorized physical contact was an assault and a violation of the Fourth Amendment's protection against unreasonable searches and seizures, as Plaintiff was inside the curtilage of his home and not suspected of any crime.

5. Startled, Plaintiff stepped inside his own house and closed the door.  The officer remained outside, shouting toward the house and attempting to provoke an argument.  Plaintiff did not respond further.

6. Plaintiff then called JPD dispatch and reported the assault, stating that an officer had unlawfully grabbed him over his fence.  The dispatcher confirmed that they had instructed the responding officer to leave the scene immediately.

7. Plaintiff then stepped to a window and advised the officer that dispatch had told him to leave. The officer replied, "I don't care what dispatch said," and continued shouting from the side of Plaintiff's house, lingering until Plaintiff's charcoal burned away, ruining the food he had been cooking.

8. No report or citation was issued that day, and no warrant existed at that time. To verify this, Plaintiff appeared the next day, April 2, 2025, at 1:30 p.m. in Judge Rita Bailey's court in Jacksonville, on a separate matter, where court personnel confirmed that no outstanding warrant was listed under Plaintiff's name.

9. Despite this, weeks later, JPD fabricated a warrant referencing the same event, falsely claiming probable cause for resisting or obstructing. The warrant was signed by Judge Bailey, who did so without verifying the falsified timeline or the absence of probable cause, effectively ratifying the officer's misconduct.

10. On or about May 2025, nearly a month after the original encounter, approximately twenty (20) JPD officers descended on Plaintiff's home and arrested him in front of his neighborhood. The operation appeared coordinated to humiliate Plaintiff publicly and shield the offending officer from accountability for the prior assault.

11. This excessive show of force was wholly unjustified for a minor or nonexistent offense and was a retaliatory arrest in violation of the First, Fourth, and Fourteenth Amendments. Plaintiff had not threatened, resisted, or harmed anyone; he had merely exercised his right to retreat into his home after being assaulted by an officer.

12. The fabricated warrant, post-incident, and publicized arrest were designed to create a false paper trail legitimizing an illegal seizure. Multiple officers later appeared as "witnesses" on the docket for Case No. JAC-25-1102, though only one had been physically present at the time of the incident.

13. The pattern shows that the JPD's leadership knowingly collaborated to frame Plaintiff, assigning additional officers as "witnesses" to conceal the solitary officer's illegal conduct and distribute collective liability across the department.

14. Plaintiff's repeated written and verbal complaints to both JPD Internal Affairs and Judge Bailey's court were ignored.  The court instead signed off on the fabricated warrant, further entrenching the cover-up and obstructing accountability.

15. This incident, though initially minor, is emblematic of the larger pattern of retaliation against Plaintiff by JPD and the Jacksonville District Court.  It demonstrates that even when Plaintiff is within his home, engaged in lawful activity, officers feel emboldened to trespass, assault, and later arrest him with impunity.

16. The deliberate falsification of warrants and post-hoc witness fabrication constitute malicious prosecution, conspiracy under color of law (42 U.S.C. § 1985), and deprivation of rights (42 U.S.C. § 1983).  The responsible parties include Officer Devin Junior, Officer Healy, Judge Rita Bailey, and other unknown JPD officers later added as "witnesses."

17. As a direct result, Plaintiff suffered loss of liberty, reputational damage, emotional distress, and property loss due to the destruction of personal effects during the later arrest.

H. 2025 – Illegal SWAT Raid and Property Damage (JAC-25-2057 / JAC-25-2066)

1. On or about May 2025, Plaintiff's residence at 212 Raney Place, Jacksonville, Arkansas was raided by the Jacksonville Police Department (JPD) and its SWAT unit. The raid occurred without a valid search warrant in place at the time of entry.

2. The underlying event began earlier that day when neighbors—specifically including Natorian Lewis, Tiffany Washington, Tonya Robinson, and Chacoila Brown—initiated a false 911 call.  Those individuals falsely claimed that Plaintiff had pointed a firearm at them, omitting the fact that they had first pointed a gun at Plaintiff, and that the person

actually holding the weapon on their side stood behind the person recording video, out of the frame.

3. When officers arrived, they immediately escalated the situation instead of investigating evenhandedly. They broke down Plaintiff's front door with a battering ram, knocked over the backyard gate, and entered the home without presenting or announcing any warrant.

4. During the entry, JPD officers destroyed property throughout the residence. They overturned furniture, scattered personal items, and intentionally left the refrigerator door open, causing all refrigerated food to spoil and creating an overwhelming odor throughout the home. Valuable property was damaged, ruined, or stolen in the process.

5. Officers located two unregistered firearms inside the home. The weapons were lawfully possessed within the home, yet officers falsely attributed ownership to Plaintiff without proof that the firearms belonged to him rather than another individual who had access to the premises.

6. Despite claiming the raid was "in response to a weapons threat," JPD did not recover any evidence supporting the neighbors' allegation that Plaintiff had initiated aggression or left his property armed. No shots had been fired, no threats were made, and Plaintiff was inside his home when officers arrived.

7. The raid was carried out before any judicial authorization existed. The following day—after Plaintiff had already been forcibly arrested and detained overnight—Judge Rita Bailey signed a retroactive warrant, effectively attempting to legalize the unlawful entry after the fact.

8. The sequence demonstrates deliberate disregard for Fourth Amendment protections and constitutes a textbook illegal search and seizure. By obtaining a warrant only after a full SWAT operation and arrest, Judge Bailey and the officers jointly violated the plain constitutional requirement that a warrant be issued upon probable cause before entry.

9. The same neighbors who initiated the false call were never charged despite admitting to possessing and displaying a firearm. JPD's own reports initially stated that those individuals would also be charged and their weapon seized, yet officers failed to follow through. Instead, they fabricated charges solely against Plaintiff.

10. During the raid and arrest, officers repeatedly attempted to coerce Plaintiff into making statements implying guilt. They asked leading questions suggesting that Plaintiff was an aggressor and ignored his requests to record or contact counsel.

11. While Plaintiff was detained, officers remained on-site for an extended period, ransacking the home and discussing the event publicly among themselves and with neighbors, further defaming Plaintiff's reputation.

12. Plaintiff's repeated complaints to JPD and to the Jacksonville District Court were ignored. No internal investigation was initiated despite multiple officers being involved in a coordinated falsification of incident chronology.

13. The officers also misrepresented facts in the probable-cause affidavit, claiming the firearms were discovered "during execution of a search warrant," when in reality no warrant had yet been issued. This misrepresentation was later used to support additional charges in Case Nos. JAC-25-2057 and JAC-25-2066.

14. The raid involved an estimated thirty (30) police vehicles, effectively turning Plaintiff's residential block into a militarized zone, blocking traffic and creating the impression that Plaintiff was a dangerous criminal. This was done for spectacle and intimidation, not safety.

15. When Plaintiff later reviewed docket entries, he discovered that the same officers who led the raid were also listed as witnesses for the prosecution, suggesting an effort to corroborate each other's false accounts and shield the original illegal entry.

16. Plaintiff further observed that, on the evening of the raid, officers refused to charge the neighbors who had brandished the gun first. This selective enforcement

underscores the racial bias and retaliatory motive that have characterized all JPD actions toward Plaintiff.

17. The unlawful entry, excessive destruction, and fabricated documentation collectively constitute violations of the Fourth Amendment, the Due-Process Clause of the Fourteenth Amendment, and 42 U.S.C. § 1983 for unlawful search and seizure, malicious prosecution, and conspiracy under color of law.

18. The responsible parties include:
   • Judge Rita Bailey, for signing a retroactive warrant to cover the illegal entry;
   • Officer Devin Junior, Officer Sabrina Harrison, and Officer Tamara Creer-Wilder, for coordinating the raid and falsifying reports;
   • Chief of Police (JPD), for failure to supervise and for approving the operation; and
   • Neighbor Defendants Natorian Lewis, Tiffany Washington, Tonya Robinson, and Chacoila Brown, for filing false police reports and inciting the raid.

19. As a direct result of the raid, Plaintiff suffered:
   (a) destruction and loss of personal property;
   (b) psychological trauma from militarized police invasion;
   (c) reputational damage within the community; and
   (d) ongoing fear of retaliatory raids.

20. The conduct described above evidences a pattern and practice by JPD and its supervising officials to manufacture criminal liability against Plaintiff and to retaliate when Plaintiff reports misconduct or seeks judicial redress.

I. 2025 – False "Gun Possession" Charges (60CR-25-4476)

1. The "gun possession" case, filed under Pulaski County Circuit Court Case No. 60CR-25-4476, stems directly from the illegal SWAT raid of May 2025 described in Section 3.H.  After unlawfully entering and searching Plaintiff's residence at 212 Raney Place, Jacksonville officers claimed to have located two firearms and subsequently charged Plaintiff with multiple felony counts of firearm possession.

2. The weapons were discovered inside the residence during the unlawful entry before any valid search warrant existed. The officers later attempted to justify their actions by back-dating the search narrative to match the retroactive warrant signed the following day by Judge Rita Bailey.

3. At the time of seizure, officers made no effort to determine ownership of the firearms. They did not request purchase records, fingerprints, or ballistic testing. The guns were simply listed as "belonging to Brent Lamar Jones" without evidence that they were his property rather than that of another lawful occupant or visitor.

4. The officers' reports falsely state that the weapons were "found in plain view." In reality, they were located in a closed interior area of the home, accessible only after the forced entry. This misrepresentation was designed to conceal the unconstitutional nature of the search.

5. Following Plaintiff's detention, JPD supervisors and the Pulaski County Prosecutor's Office—specifically Prosecutor William Martin Jones—used the illegally seized firearms to file new felony charges. These charges were duplicative of prior accusations already pending and formed part of a continuing strategy to stack charges in order to pressure Plaintiff into a plea deal.

6. No evidence was ever presented that Plaintiff had brandished, used, or transported any firearm illegally. The sole basis of the charges was constructive possession, asserted because the firearms were found in the same residence.

7. The criminal complaint and supporting affidavit both omit the crucial fact that the search occurred without a valid warrant. Instead, the documents misleadingly claim the seizure resulted from "lawful execution" of a court order. This was deliberate falsification intended to sanitize an unlawful raid.

8. The case was assigned to Judge Leon Johnson, who had already consolidated Plaintiff's earlier matters. Despite Plaintiff's repeated pro se motions contesting

jurisdiction and asserting Fourth Amendment violations, Judge Johnson refused to dismiss the case or hold an evidentiary hearing on the warrant issue.

9. During hearings, Judge Johnson, Prosecutor William Martin Jones, and Court-Appointed Counsel Jason Ables continued the established pattern of coercive plea tactics, repeatedly suggesting that Plaintiff "accept responsibility" or "consider an insanity plea" instead of allowing the case to be tried or dismissed.

10. When Plaintiff asserted his right to proceed pro se and sought discovery, the prosecution filed motions demanding that Plaintiff disclose his intended trial defense, an improper and unconstitutional discovery demand. This constitutes clear prosecutorial misconduct and violates the Fifth Amendment privilege against self-incrimination.

11. The continued pursuit of these firearm charges—despite their being rooted entirely in an illegal search—illustrates a pattern of retaliatory prosecution designed to silence Plaintiff's ongoing complaints against Jacksonville Police Department and local judges.

12. This case has now remained open for over a year, with multiple continuances, psychological-evaluation orders, and rescheduled hearings, all intended to delay resolution and keep Plaintiff under court supervision.

13. Each continuance has resulted in additional bond expenses, travel restrictions, and employment disruption. Plaintiff has been prevented from obtaining long-term work or leaving the jurisdiction because of the open charges, effectively placing him under a form of civil restraint without conviction.

14. The false firearm charges directly derive from the misconduct of:
 • Officer Devin Junior, Officer Sabrina Harrison, and Officer Tamara Creer-Wilder, for the illegal seizure and falsified affidavits;
 • Judge Rita Bailey, for issuing a retroactive warrant to legitimize the unconstitutional search; and
 • Prosecutor William Martin Jones, for initiating and maintaining charges based on illegally obtained evidence.

15. This conduct violates Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments, including freedom from unreasonable search and seizure, the right against self-incrimination, and the right to due process and equal protection of law.

16. Plaintiff seeks compensatory and punitive damages for malicious prosecution, unlawful seizure of property, emotional distress, and violation of constitutional rights, as well as injunctive relief ordering dismissal of all related charges in Case No. 60CR-25-4476.

J. 2025 – August 10 – October 5 – October 8 Retaliation Sequence (McAfee Incident)

1. On August 10, 2025, at approximately 9:57 a.m., Michael McAfee, a neighbor on Raney Place in Jacksonville, Arkansas, approached Plaintiff's property at 212 Raney Place brandishing a folding chair in a threatening manner. Video evidence recorded by Plaintiff shows McAfee entering the edge of Plaintiff's yard while posturing aggressively, shouting, and attempting to provoke a physical fight.

2. A few minutes later, around 10:08 a.m., McAfee and residents of his property, called police and falsely claimed that Plaintiff was the aggressor.

3. Officers of the Jacksonville Police Department (JPD) responded. When they arrived, they were informed by McAfee and his family that Plaintiff was initiating aggression towards McAfee. In reality, McAfee had initiated the confrontation and had been armed with both the folding chair and, minutes later, a large metal pole, which he swung at Plaintiff while the crowd encouraged him, and a JPD police patrol watched, then allowed McAfee to return to his property with the large metal pole he attacked Plaintiff with, clearly on police dash cam video. Afterwards JPD simply drove away quietly.

4. Dash-cam and body-cam footage, which Plaintiff requests be preserved through discovery, will show that officers observed McAfee attack Plaintiff with the pole and then simply drove away, failing to intervene or arrest McAfee despite witnessing a violent

assault. This deliberate inaction created a public spectacle, humiliating Plaintiff and signaling to surrounding residents that JPD officers condoned violence against him.

5. The entire neighborhood—many of whom are listed co-defendants—were present, cheering or encouraging the assault rather than stopping it. This will also be visible on the officers' dash-cam footage during the incident. These are the same people falsely testifying in the other cases as well. This one dash cam video should clearly show them all being the aggressors and the police allowing it to happen.

6. Two months later, on October 5, 2025, at approximately 8:41 a.m., Plaintiff was in his backyard with his two dogs when Officers Devin Junior and Jeremy Dunlap suddenly arrived at high speed, brandishing an AR-15-style rifle. Plaintiff had been awake for about ten minutes, wearing house clothing, and standing on his own property when the officers detained him without explanation.

7. Officer Junior, after securing his rifle, reached over Plaintiff's backyard fence and grabbed his wrist, asserting that Plaintiff was "detained." Plaintiff told the officers he was not resisting and that physical contact was unnecessary. They ignored him, placed him in handcuffs, and refused to explain the reason for detention, merely stating, "We'll get to that."

8. The officers then went to speak with Michael McAfee, the same neighbor who had attacked Plaintiff with the pole on August 10. Within minutes, the officers fabricated a basis for arrest, falsely alleging terroristic threatening based solely on McAfee's new accusation.

9. Plaintiff was transported to JPD headquarters and later to the Pulaski County Detention Center. He was read Miranda rights only after repeatedly requesting an attorney. Plaintiff again urged the officers to interview nearby residents who had been within earshot, which would have immediately revealed McAfee's fabrication. Officers laughed and dismissed his requests, stating only, "You're under arrest."

10. During interrogation, Plaintiff told the officers that McAfee was the same individual who had attacked him with the large pole while they previously stood by. Officers

clearly recognized the truth of this statement after reviewing their own recordings but proceeded with the arrest anyway, indicating deliberate retaliation.


11. As a result of this unlawful arrest, Plaintiff was detained for two days, causing his home to be left unsecured and subsequently burglarized. Property was stolen, and Plaintiff incurred additional costs for a dog sitter, bond fees, and other expenses associated with release.


12. When Plaintiff returned home on October 6 around 5:24 p.m., he had barely stepped onto his property when McAfee again emerged from his residence, staring and pacing back and forth in an intimidating manner. Plaintiff recorded this behavior briefly as evidence and retreated to avoid another provoked incident.


13. Notably, on October 4 – the day before this retaliatory arrest – Plaintiff had emailed Public Defender Jason Ables a complete list of all defendants he intended to sue, including Officer Devin Junior. The very next morning, that same officer arrived with his rifle drawn to arrest Plaintiff without cause. This temporal proximity establishes clear retaliation for protected activity—the exercise of Plaintiff's First Amendment right to pursue redress of grievances.


14. Finally, on October 8 around 6:30 a.m., while Plaintiff was in his garage at the rear of his property with his dogs, McAfee again called out to him across the street, intentionally violating the no-contact order that had been issued against Plaintiff by McAfee after the October 5 arrest. Plaintiff said nothing, immediately telephoned JPD dispatch at 6:35 a.m., and filed a report documenting McAfee's continued harassment. Had Plaintiff said anything to McAfee, the antagonist, McAfee and family would have called the police reporting a violation of the no contact order, which was likely planned together by McAfee and police.


15. Despite this report, no further action was taken by JPD. McAfee continues to reside across the street and continues to harass Plaintiff under the protection of the same officers who unlawfully arrested him.

16. This entire sequence—August 10 through October 8—forms a single continuum of retaliation, neglect, and malicious prosecution. JPD's failure to arrest the actual aggressor, combined with their subsequent armed detention of Plaintiff immediately after he prepared to file suit, demonstrates an orchestrated effort to silence him and obstruct his access to the courts.

17. The responsible parties for this series of events include:
   • Michael McAfee, civilian aggressor and false complainant;
   • Officer Devin Junior, primary arresting officer with AR-15 rifle;
   • Officer Jeremy Dunlap, assisting officer;
   • Jacksonville Police Department Command, for authorizing retaliatory action; and
   • Judge Leon Johnson, for maintaining jurisdiction and continuing the prosecution without probable cause.

18. Plaintiff asserts violations of his First, Fourth, Fifth, and Fourteenth Amendment rights, including retaliation for protected speech, unlawful seizure, denial of due process, and equal-protection violations.

19. Plaintiff requests immediate injunctive relief directing the cessation of all related prosecutions and court-ordered protection from further retaliation by JPD officers or affiliated witnesses.

/s/Brent Lamar Jones